UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES EDMUND BLAU,

          Plaintiff,                      Case No. 1:11-cv-1085

v.                                            Honorable Robert J. Jonker

PRISON HEALTH SERVICES, INC. et al.,

          Defendants.
_____/

## OPINION

This is a prisoner civil rights action brought by Plaintiff James Edmund Blau under 42 U.S.C. § 1983 and state law. Before the Court is Plaintiff's motion for a temporary restraining order and/or a preliminary injunction (docket #3). For the reasons that follow, Plaintiff's motion will be denied.

## Factual Allegations

Plaintiff James E. Blau presently is incarcerated with the Michigan Department of Corrections (MDOC) and housed at the Lakeland Correctional Facility (LCF). Plaintiff sues Prison Health Services, Inc. (PHS), and the following employees of LCF and/or PHS: Dr. Syed Sohail, Dr. Hamini Sudhir, Dr. (unknown) Burns, Nurse Practitioner (NP) Raymond Ingraham, and NP Jolane Conklin.

According to the amended complaint, Plaintiff has a degenerative joint condition that causes pain in his lower back, elbows and knees. Prior to 2010, he had been treated for osteoarthritis for many years. On May 26, 2010, Plaintiff met with Dr. Burns and told him about "severe pain" in his joints, knees and back. (Am. Compl. ¶ 14, docket #7-1.) Dr. Burns cut all of Plaintiff's medications and refused to treat Plaintiff's condition, claiming that Plaintiff did not have

arthritis.  On May 26, June 9, and June 30, Plaintiff filed and pursued a grievance regarding regarding Dr. Burns's refusal to treat his "severe, chronic pain" and degenerative joint disease. (*Id*. at ¶ 18.)  Without medication, Plaintiff's joints hurt and his knees swelled.

In August 2010, Plaintiff's left knee gave out while he was jogging.  Afterwards, his knee swelled and caused him "extreme pain."  (Am. Compl. ¶ 21.)  Plaintiff could "barely walk on some days, and then only with a pronounced limp." (*Id.*)  He suspected that he had torn a ligament or that there was loose debris inside the knee joint.  The pain from his injury was "new and distinct" from his previous pain; it kept him awake at night and made it difficult for him to stand or walk.  (*Id.* at ¶ 22.) He sent several kites requesting medical assistance.

On August 8, a nurse saw Plaintiff and referred him to Defendant Dr. Sohail.  Dr. Sohail met with Plaintiff on September 7.  Dr. Sohail told Plaintiff that he could not prescribe any prescription strength pain relievers or refer Plaintiff to a specialist, "per policy." (Am. Compl. ¶ 25.) Instead, Dr. Sohail prescribed Mobic, even after Plaintiff informed Sohail that Plaintiff had experienced adverse side effects while taking Mobic in the past.  Plaintiff asserts that he was unable to use Mobic.

On September 9, x-rays were taken of Plaintiff's left knee.  The x-ray report, which is attached to Plaintiff's original complaint, notes:

> [f]our views of the left knee reveal mild degenerative changes. There is a small fracture of the medial patella seen on the sunrise view only.  Position is satisfactory.  The age is indeterminate. Follow-up studies or a CT scan is recommended.  Joint effusion is noted.

(Ex. A to Compl., docket #1-2, Page ID#34.)  Dr. Sohail made the following note regarding the x-ray findings:

> X-ray tunnel view shows mild DJD with undeterminate small Fx of medial patella.  On clinical picture I do not think he has an acute onset of medial patellar fx- hence a F/U scan is not indicated.

(*Id.* at Page ID#35.) Dr. Sohail did not order prescription pain medication or further treatment.

On October 6, Plaintiff sent a medical kite complaining of pain in his left knee that was so severe he could barely walk. On October 14, NP Ingraham met with Plaintiff and told him that Plaintiff was "not a 'normal person,'" and he would not receive additional treatment for his condition. (Am. Compl. ¶ 36.) Ingraham prescribed 30 days of ibuprofen. Plaintiff explained that his knee pain was more serious than his arthritis pain, but Ingraham refused to provide additional treatment or refer Plaintiff to a doctor.

On October 17, Plaintiff filed a grievance regarding his "severe pain" and lack of treatment. (Am. Compl. ¶ 41.) By November 2010, the knee pain had increased so much that "[s]ometimes [Plaintiff] had to hop to get around." (*Id*. at ¶ 42.) On December 18, 20, and 22, 2010, Plaintiff sent health care kites complaining about severe pain, particularly in his left knee.

On December 23, Plaintiff's knee collapsed again and he fell, landing on his lower back. He sent several kites to health services requesting help, but he did not receive treatment or an examination. Thereafter, the pain in his back and knee became so acute that he could not sleep and sometimes at night he had to hop on one leg to get to the bathroom. When he could walk, he could only walk for 20 minutes at a time. It hurt for him to urinate, defecate or pass gas. When he sat up or leaned over, he felt "stabbing pains" in his lower spine, leg, and groin. (Am. Compl. ¶ 49.) He
sent several medical kites complaining about the pain.

Plaintiff was scheduled to see NP Ingraham on December 27, but the appointment was cancelled. On December 29, 2010, he met with Nurse Nathaniel Nestbaum and described the knee and back pain "due to [his] recent injury by falling in the courtyard." (Am. Compl. ¶ 51.) Plaintiff was referred to a doctor, but no treatment or medication was given.

In January 2011, Plaintiff sent multiple kites complaining of severe pain in his knee and back. Plaintiff was scheduled for two doctor visits in January, but the appointments were cancelled, ostensibly due to emergencies. Finally, on January 20, Plaintiff met with a nurse regarding his knee and back pain. No treatment was given at that time.

On January 31, Plaintiff met with NP Conklin, who said that Plaintiff could not receive any more treatment other than NSAIDs. Conklin explained that being a prisoner "complicated" the treatment of arthritis and back pain, and that because NSAIDs had adverse side effects for Plaintiff, health care staff felt "'backed . . . into a box'" and were helpless to treat him. (Am. Compl. ¶ 61.) Conklin recommended that Plaintiff obtain Tylenol from the prison store.

On February 10, Plaintiff's left knee collapsed while he was climbing into his bunk and he landed on his tail-bone. He could not get up and was carried to the health care clinic. He received some medication at the clinic, and after a few hours the pain had subsided enough so that he could limp back to his unit. On his way out of the clinic, Plaintiff saw NP Ingraham and complained about his back and knee pain from before the fall. Ingraham issued a five-day prescription for Baclofen, a muscle relaxant, and Ultram, a prescription pain-killer.

Thereafter, the pain in Plaintiff's spine intensified. From February 10 to 23, Plaintiff sent several health care kites requesting continued pain medication until he could see a doctor. On February 26, Plaintiff was seen by Dr. Sudhir, who conducted a "cursory" examination of Plaintiff's knee and ran his finger along Plaintiff's spine to examine his back. (Am. Compl. ¶ 74.) Sudhir said that Plaintiff's back would be fine, and he refused to prescribe any pain medications for Plaintiff, refer him to a specialist, or order any further tests to determine the extent of his back and/or knee injuries. Sudhir told Plaintiff, "'my hands are tied.'" (*Id.* at ¶ 76.) Sudhir stated that a lack of muscle was causing the pain in Plaintiff's knee and that isometrics and positive thinking would heal the pain. Sudhir agreed to order a steroid injection for Plaintiff's knee, however.

On March 1, Plaintiff filed a grievance complaining of excruciating pain from his knee and back injuries, as well as chronic pain from his degenerative joint disease. By March 6, no action had been taken, so Plaintiff sent a kite to health care services complaining of extreme pain. At that time, he contends that his knee had "50% mobility[] and hurt to walk on," and his back was in constant pain. (Am. Compl. ¶ 80.) Because of the pain, he had trouble bending over, getting up, or sitting down.

On March 8, Dr. Sohail administered the first of several cortisone injections to Plaintiff's left knee. The injection eased some of the knee pain. Dr. Sohail also ordered a six-month bottom bunk detail and x-rays of the left knee. When Plaintiff complained about his back, Dr. Sohail refused to examine it, telling Plaintiff to send a request to health care. On March 9, Plaintiff sent a medical kite complaining of severe pain in his back and requesting medication and treatment.

By March 12, the effects of the steroid injection had worn off, and the severe pain in his knee returned. On March 18, x-rays were taken of Plaintiff's left knee and back. The report for the back x-ray notes the following:

> Two views of the lumbar spine reveal vertebral body heights, disc spaces, pedicles, and sacroliac joints within normal limits. Some minimal facet arthritis at the lumbrosacral junction is not excluded. There is no evidence of acute fracture or subluxation. Slight marginal spurring at the thoracolumbar junction is noted.
>
> IMPRESSION: MINIMAL DEGENERATIVE CHANGES. NO EVIDENCE OF ACUTE FRACTURE OR SUBLUXATION.

(Ex. B to Compl., docket #1-2, Page ID#38.) The report for the knee x-ray notes the following:

> There is joint space narrowing and spurring. A small patellar spur is demonstrated. A minimal joint effusion is not excluded. If symptoms persist, a progress study or CT would be of further diagnostic aid.
>
> IMPRESSION: DEGENERATIVE ARTHRITIS AND QUESTION SMALL JOINT EFFUSION.

(Ex. B to Compl., docket #1-2, Page ID#37.)  On March 24, Plaintiff wrote another complaint describing severe pain in his knee and back.       On April 12, Plaintiff met with Defendant NP Ingraham.  She refused to provide any treatment.

On April 24, Plaintiff complained of excruciating pain from his back and knee injuries and requested to see a specialist.  He met with Defendant Dr. Sohail on April 26.  Sohail told Plaintiff that the x-rays revealed nothing but mild arthritis.  Sohail also administered a second injection to Plaintiff's knee.  Plaintiff complained to Sohail that the injections would only provide temporary relief from the underlying injury or disease, but Sohail refused to provide further treatment.  Sohail advised against a full knee placement.  When Plaintiff complained about pain in his back, Sohail said he would prescribe Celebrex, another NSAID.  The Regional Medical Officer later denied the prescription for Celebrex and suggested Mobic instead.

The injection reduced Plaintiff's swelling and pain for a week, but the knee continued to lock up and slip out of joint.  Plaintiff could not run, lift weights or play sports.  By May 23, the knee pain had returned to its previous level.  Plaintiff sent a kite to health care describing extreme pain in his back and knee, as well as "all arthritic joints."  (Am. Compl. ¶ 103.)

On June 21, Sohail prescribed Tegretol for pain relief, pending review by the pain management committee.  Sohail prepared a report for the committee that allegedly understated Plaintiff's complaints and did not "clearly" indicate that Plaintiff had already tried NSAIDs for ten years, with severe side effects.  (Am. Compl. ¶ 113.) Plaintiff contends that Tegretol is not effective for pain relief and is contraindicated for individuals like him because he has glaucoma and had a blood clot in his eye.  From June 23 to June 27, Plaintiff sent a number of medical kites complaining of side effects that he suffered from Tegretol, including blurred vision, irregular heartbeat, vomiting, nausea, dizziness, and depression.  On June 29, the Regional Medical Officer denied approval for Tegretol, stating that it is not medically indicated.

Plaintiff met with Sohail again on June 30 and July 11 and complained to him about his knee and back pain. Sohail refused to refer Plaintiff to a specialist, order further diagnostic tests, or administer "effective" pain relief. (Am. Compl. ¶¶ 119, 121.)

On August 3, NP Ingraham told Plaintiff that the pain management committee recommended Tylenol and Mobic for Plaintiff's pain. Plaintiff refused the Mobic because of the side effects. Plaintiff sent several more medical kites complaining about pain and/or requesting medication.

On August 24, Plaintiff met with Dr. Charles Zimont, a doctor practicing sports medicine. He informed Plaintiff that the "'game plan'" was to delay treatment until Plaintiff was released from prison (though Plaintiff is serving a life sentence). (Am. Compl. ¶ 131.) Zimont administered a third steroid injection to Plaintiff's knee, and inspected Plaintiff's knee internally using a needle. Dr. Zimont later prepared a report stating that, "'the next time the joint swells, please drain the fluid and look for bloody color and then re-x-ray or MRI. [Plaintiff] will probably need an arthroscopic exam." (*Id.*) Zimont recommended a low dosage of Ultram, but the Regional Medical Officer denied this request.

Plaintiff met with Dr. Sudhir on September 2, who told Plaintiff that her "hands were tied" and she could not prescribe any pain relievers. (Am. Compl. ¶ 134.) She referred Plaintiff to the pain management committee. Plaintiff met with Sudhir again on September 19, and she refused to treat Plaintiff's knee and back. She claimed that the only available treatment for Plaintiff's knee is either NSAIDs or reconstructive surgery, and the only available treatment for his back pain and arthritis is ibuprofen.

In October, Plaintiff sent several more medical kites complaining about knee and back pain. On October 17, NP Ingraham told Plaintiff that the only thing wrong with him was mild arthritis. When Plaintiff pulled out copies of his x-ray reports, she said, "I don't want to see those!

They won't matter! This conversation is done," and then she left the room. (Am. Compl. ¶ 153.)

Plaintiff claims that the individual Defendants violated his rights under the Fourteenth and Eighth Amendments by refusing to provide effective treatment for the injuries and pain in his back and knee. He further contends that PHS violated his rights under the Eighth Amendment "by promulgating or practicing policies which were sure or very likely to cause serious harm and needless suffering to Plaintiff by restricting the ability of other LCF medical staff to prescribe medications and order treatment for Plaintiff." (Am. Compl. 29, Page ID#185.) In addition, he claims that PHS breached its contract with the MDOC to provide adequate health care to prisoners.

## Discussion

Plaintiff moves the Court for a temporary restraining order (TRO) and/or preliminary injunction requiring Defendants to provide additional treatment for his condition, including the administration of prescription pain medication. Rule 65 of the Federal Rules of Civil Procedure authorizes the issuance of both preliminary injunctions and temporary restraining orders. The issuance of preliminary injunctive relief is committed to the discretion of the district court. *See Ne. Ohio Coal. for the Homeless v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006); *Nader v. Blackwell*, 230 F.3d 833, 834 (6th Cir. 2000). The party seeking injunctive relief bears a heavy burden of establishing that the extraordinary and drastic remedy sought is appropriate under the circumstances. *See Overstreet v. Lexington- Fayette Urban County Gov't*, 305 F.3d 566, 573 (6th Cir. 2002); *Stenberg v. Cheker Oil Co.*, 573 F.2d 921, 925 (6th Cir. 1978); *see also O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1986). The court considers the same factors in determining whether to issue a TRO or a preliminary injunction. *Ne. Ohio Coal.*, 467 F.3d at 1009. Those factors are: (1) a strong or substantial likelihood of success on the merits; (2) the likelihood of irreparable injury if the preliminary injunction does not issue; (3) the absence of harm to other parties; and (4) the protection of the public interest by issuance of the injunction. *Id.* The foregoing

factors are not prerequisites to the grant or denial of injunctive relief, but they must be "carefully balanced" by the district court in exercising its equitable powers. *Frisch's Rest., Inc. v. Shoney's, Inc.*, 759 F.2d 1261, 1263 (6th Cir. 1985). The failure to show a substantial likelihood of success on the merits is usually fatal to a request for preliminary injunctive relief. *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000). Moreover, where a prison inmate seeks an order enjoining state prison officials, the court is required to proceed with the utmost care and must recognize the unique nature of the prison setting. *See Glover v. Johnson*, 855 F.2d 277, 284 (6th Cir. 1988); *Kendrick v. Bland*, 740 F.2d 432 at 438, n.3 (6th Cir. 1984).

With regard to the first factor, Plaintiff has not demonstrated a strong or substantial likelihood of success on the merits of his action. While the Court has determined that the allegations in Plaintiff's amended complaint are sufficient to survive dismissal at this stage, it is not at all clear that Plaintiff has a substantial likelihood of success on his Eighth Amendment claim (or on his state-law claim for breach of contract). The Eighth Amendment is violated when a prison official is deliberately indifferent to the serious medical needs of a prisoner. *Estelle v. Gamble*, 429 U.S. 102, 104-05 (1976); *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001). Considering, among other things, the extensive medical attention and treatment that Plaintiff did receive from Defendants, the Court cannot find that Plaintiff has a substantial likelihood of success on a claim that Defendants were deliberately indifferent to his needs, much less that Defendants violated the terms of a contract that the Court has not seen.

With regard to the second factor, the Court acknowledges the possibility of irreparable harm resulting from continuing pain and/or possible degeneration in Plaintiff's condition in the absence of treatment. On the other hand, the interests of identifiable third parties and the public at large weigh against an injunction ordering additional medical care. Any interference by the federal courts in the administration of state prisons, including interference in the administration

of medical treatment, is necessarily disruptive. Prison officials and Plaintiff's medical providers are in a far better position to make treatment decisions than the Court. The third and fourth factors, therefore, militate against the issuance of extraordinary relief in this context, absent a sufficient showing of a violation of constitutional rights. *See Glover*, 855 F.2d at 286-87. That showing has not been made here.

## Conclusion

For the reasons set forth herein, Plaintiff's motion for preliminary injunctive relief will be denied. An order will be entered that is consistent with this Opinion.

                                                    /s/Robert J. Jonker
                                              ROBERT J. JONKER
                                    UNITED STATES DISTRICT JUDGE

Dated: January 31, 2012