UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES E. BLAU,

          Plaintiff,

v.

PRISON HEALTH SERVICES, *et al.*,

          Defendants.

_____/

Case No. 1:11-CV-1085

Hon. Robert J. Jonker

## REPORT AND RECOMMENDATION

This is a civil rights action brought by a state prisoner pursuant to 42 U.S.C. § 1983. This matter is now before the court on a motion for summary judgment filed by defendants Prison Health Services, Inc. (PHS)[1], Dr. Syed Sohail, Dr. Bhamini Sudhir, Dr. Brian Burns, Ryan Ingraham, NP, and Jolane Conklin, NP (docket no. 44).

## I.  Plaintiff's Amended Complaint

## A.  Allegations

In his amended complaint, plaintiff alleged that defendants failed to provide him with constitutionally adequate medical care from May 26, 2010 through October 17, 2011. Amend. Compl. at ¶¶ 14-155.[2] The alleged events occurred while plaintiff was under the custody of the Michigan Department of Corrections (MDOC) at the Lakeland Correctional Facility (LCF).

Plaintiff set forth the following chronology of events. On May 26, 2010, plaintiff met with Dr. Burns regarding pain in his knees and back. Amend. Compl. at ¶ 14. (As discussed, *infra*,

_____

[1] The Court notes that PHS now known as Corizon Health, Inc.

[2] The court notes page 24 of plaintiff's amended complaint, which apparently included a portion of ¶ 147, ¶¶ 148-51, and a portion of ¶ 152, was not filed in this court.

plaintiff actually saw Dr. Burns on April 23, 2010.) While plaintiff explained that he had been treated for osteoarthritis "for many years," Dr. Burns would not treat the condition and told plaintiff that he did not have arthritis. *Id.* at ¶¶ 15-16. According to plaintiff, Dr. Burns denied him treatment, told him that the NSAID (non-steriodal anti-inflammatory drug) "Meloxicam" would "kill" plaintiff and that he was not allowed to prescribe plaintiff "any other potentially helpful medication." *Id.* Dr. Burns failure to treat plaintiff subjected him to swollen joints and severe pain in his knees, elbows and back. *Id.* at ¶ 17.

Sometime during the first week of August 2010, plaintiff suffered an injury while jogging, when his left knee "gave out" and he fell on his hands and knees, "slamming [his] knee onto the track." *Id.* at ¶ 21. On August 8, 2010 plaintiff was called to health services in response to medical kites and described his pain and injury to nonparty RN Baker. *Id.* at ¶ 23. RN Baker referred plaintiff to Dr. Sohail. *Id.*

On September 7, 2010, Dr. Sohail saw plaintiff regarding his serious knee injury. *Id.* at ¶ 24. On September 9, 2010, plaintiff had x-rays which demonstrated that he had degenerative joint disease (DJD) and osteoarthritis. *Id.* at ¶ 26. X-rays of plaintiff's left knee taken that day revealed mild degenerative changes and a small fracture of the medial patella of an indeterminate age. *Id.* at ¶¶ 31-32. In a clinical progress note dated September 13, 2010, Dr. Sohail noted that plaintiff had "mild DJD" and a small fracture of the patella which was not acute. *Id.* at ¶ 32. The doctor further noted that a CT scan was not indicated by these conditions. *Id.*

October 6, 2010 plaintiff sent a medical kite complaining of severe pain in the left knee and that he "could barely walk." *Id.* at ¶ 35. October 14, 2010 plaintiff met with NP Ingraham, at which time plaintiff showed Ingraham "several articles and reference books which illustrate a

variety of joint pain remedies, such as cortisone shots, hyrulic [sic] acid shots, glucosmin-chronditon [sic] supplements, medical (soft-soled) shoes, etc." *Id.* at ¶ 36. However, Ingraham told plaintiff that he was not a "normal person" [apparently referring to a person outside of prison] and that plaintiff would not receive any more treatment for his condition. *Id.* at ¶ 37.

In the latter part of December 2010, plaintiff sent three complaints to health care: a grievance complaining of extreme joint pain and asking for treatment (December 18th); a medical kite complaining of severe pain in the left knee (December 20th); and a medical kite complaining of severe pain (December 22nd). *Id.* at ¶¶ 43-45. On December 23, 2010, plaintiff suffered from excruciating pain after his "knee collapsed" and he fell on his lower back. *Id.* at ¶ 46. Plaintiff had an appointment with NP Ingraham on December 27, 2010, but that appointment was cancelled. *Id.* at ¶ 50. On December 29, 2010, plaintiff went to health services callout and spoke with a nurse about his extreme knee pain and severe pain in the back. *Id.* at ¶ 51.

In early January 2011, plaintiff sent out at least four complaints to health care: a kite complaining of extreme pain in his knee and back (January 5th); a kite complaining of severe pain in lower spine, elbows, knees and hands (January 7th); a kite complaining of severe swelling and extreme pain in knee and back (January 11th); and a kite complaining of denial of treatment and chronic pain (January 14th). *Id.* at ¶¶ 52-57. During "January 2011" plaintiff was placed on call-out to see a doctor twice but these were canceled due to other "emergencies". *Id.* at ¶ 53. On January 20, 2011, plaintiff went to health care call-out and met with a nurse who provided no treatment. *Id.* at ¶ 58.

On January 31, 2011, plaintiff met with NP Conklin who denied plaintiff's request for an x-ray or CT scan, failed to refer plaintiff to a specialist, advised plaintiff that he would receive

no treatment other than NSAIDs. *Id.* at ¶¶ 59-60. According to plaintiff, NSAIDS caused him "painful and bloody bowel movements, cramps, constipation, and diarrhea." *Id.* at ¶ 60. Because plaintiff could not take NSAIDs, NP Conklin told plaintiff the medical providers were helpless to treat him. *Id.* at ¶ 61. That same day, plaintiff filed a grievance regarding joint pain caused by DJD. *Id.* at ¶ 65.

On February 10, 2011, plaintiff fell from a bunk, was carried to health care, had symptoms "indicating serious injury", was given medication, and told to go back to the unit. *Id.* at ¶¶ 66-67. At that time, NP Ingraham told plaintiff that he "would take these complaints seriously" and that plaintiff would see a doctor in less than five days. *Id.* at ¶ 69. That same day, NP Ingraham issued plaintiff a 5-day prescription of Baclofin (a muscle relaxer) and Ultram[3]. *Id.* at ¶ 70. Plaintiff stated that from February 10 through February 23, 2011, he sent four health care requests asking for continuation of his pain medications. *Id.* at ¶ 72. Then, on February 22, 2011, plaintiff filed a grievance regarding severe joint pain and a self-diagnosed "torn ligament." *Id.* at ¶ 73. Plaintiff saw Dr. Sudhir on February 26, 2011, who provided only a cursory examination and, according to plaintiff, refused "to order x-rays, CT scans or MRIs to determine the extent of injuries to Plaintiff's spine and knee." *Id.* at ¶¶ 74-76.

On March 1, 2011, plaintiff filed a grievance complaining of excruciating pain and requested a referral to the MDOC's Pain Management Committee (PMC). *Id.* at ¶ 79. Plaintiff followed the grievance by filing a health care kite on March 6, 2011 citing "EXTREME pain." *Id.* at ¶ 80. On March 8, 2011, Dr. Sohail administered the first of three cortisone/steroid injections

---

[3] While plaintiff referred to Ultram as a "non-opiod pain killer," Amend. Comp. at ¶ 70, it has been identified as an opiod. *See Thomas v. Douglas*, No. 9:09-cv-548, 2010 WL 3724183 at *7, fn. 8 (N.D.N.Y. Aug. 12, 2010)("Ultram is a trademark preparation of tramadol hydrochloride, an opiod analgesic used for treatment of moderate to moderately sever pain following surgical procedures").

into plaintiff's left knee, issued a bottom-bunk detail, and ordered x-rays for his left knee. *Id.* at ¶ 81. The next day, plaintiff sent a kite complaining of severe pain and asking for medication and treatment. *Id.* at ¶ 84. X-rays were taken of plaintiff's left knee and back on March 18, 2011. *Id.* at ¶ 87. Six days later, plaintiff filed grievance regarding severe pain in his knee and back and requesting treatment. *Id.* at ¶ 90.

On April 12, 2011, plaintiff met with NP Ingraham who "refused to administer any treatment." *Id.* at ¶ 92. On April 24, 2011, plaintiff sent written complaint that he suffered from excruciating pain in knee and back and requested a referral to see a specialist. *Id.* at ¶ 93. On April 26, 2011, Dr. Sohail administered the second of three cortisone/steroid injections into plaintiff's left knee, advised plaintiff that the x-rays showed mild or very mild arthritis in his knee and back. *Id.* at ¶¶ 95-96. According to plaintiff, Dr. Sohail "deliberately hid the actual damaged condition of my joints in my knee and back" and "attempted to talk me out of a knee replacement." *Id.* at ¶¶ 95-98.

On May 23, 2011, plaintiff sent a kite regarding extreme pain in the back, knee and all of his "arthritic joints." *Id.* at ¶ 103. On May 26, 2011, plaintiff wrote a grievance against PHS, NP Ingraham, NP Conklin, Dr. Sudhir and Dr. Sohail for deliberate indifference to his medical needs. *Id.* at ¶ 106.

On June 21, 2011, Dr. Sohail administered the third of the three steroid injections, prescribed Tegretol for pain, and assisted plaintiff in completing a request directed to the PMC. *Id.* at ¶¶ 107-10. However, according to plaintiff, Dr. Sohail "misrepresented" plaintiff's condition to the PMC. *Id.* at ¶ 113. On June 29, 2011, plaintiff wrote a grievance complaining of severe pain and requesting a specialist. *Id.* at ¶ 116. The next day, plaintiff met with Dr. Sohail, but the doctor

"refused to refer me to a specialist, run further diagnostic tests, or administer effective pain relief." *Id.* at ¶ 119.

On July 7, 2011, plaintiff sent a kite to the health care department complaining of his extreme pain and asking about the PMC's recommendation. *Id.* at ¶ 120. On July 11, 2011, plaintiff met with Dr. Sohail, who refused: to refer plaintiff to knee and back specialists; to run further diagnostic tests; or to prescribe effective pain medications. *Id.* at ¶ 121. On July 24, 2011, plaintiff file a "written complaint" regarding his severe pain and requested treatment and referral to a specialist. *Id.* at ¶ 122.

On August 3, 2011, plaintiff met with NP Ingraham, who advised plaintiff that the PMC ordered Tylenol and Mobic for his pain. *Id.* at ¶ 123. Plaintiff refused the Mobic because it caused him "extremely adverse side effects in the GI tract." *Id.* at ¶ 124. The next day, plaintiff sent a "written complaint" regarding no effective pain management for his "injuries and DJD." *Id.* at ¶ 125. On August 8, 2011, plaintiff sent a kite complaining of severe pain and asking for help, and on August 9, 2011, plaintiff sent two kites "directly to the doctor" indicating that he appealed the PMC decision and requesting "that he begin treatment, further examination, and prescription of pain medication." *Id.* at ¶¶ 126-28. According to plaintiff, on August 10, 2011, non-party RN Sparling "intercepted" plaintiff's kites and advised plaintiff that he would see the doctor later in the month. *Id.* at ¶ 129. On August 20, 2011, plaintiff sent a kite complaining of severe knee and back pain and "pain in my arthritic joints." *Id.* at ¶ 130. On August 24, 2011, plaintiff met with non-defendant and "temporary replacement" Dr. Zimont who administered a fourth steroid shot to plaintiff's left knee, examined the knee, noted that plaintiff's knee might require an x-ray, MRI or arthroscopic examination, requested a low dosage of Ultram from the MDOC Regional Medical Officer, and

informed plaintiff that the "game plan" was to delay treatment until he was released from prison. *Id.* at ¶ 131.[4]  On August 30, 2011, plaintiff sent a "written complaint" regarding lack of adequate pain medication.  *Id.* at ¶ 132.

On September 2, 2011, plaintiff met with Dr. Sudhir, who advised plaintiff that she could not prescribe any pain relievers and that she would meet with him at a later date to submit another PMC request.  *Id.* at ¶¶ 133-36.  On September 19, 2011, plaintiff met with Dr. Sudhir to fill out the new PMC application, but according to plaintiff,  but the doctor "steadfastly refused to treat my back and knee injuries, despite three separate doctors' recommendations for CT, MRI, and arthroscopic exams" and said that her "hands are tied" due to MDOC pain management policy which restricts prescribing medications other than NSAIDs.  *Id.* at ¶¶ 137, 138, 140-42.  Dr. Sudhir also denied that other doctors had recommended a CT scan, an MRI and an arthroscopic examination. *Id.* at ¶¶ 138, 140.

October 11, 2011, plaintiff sent a kite to health care regarding his severe knee and back pain and asking for treatment.  *Id.* at ¶ 144.  Two days later plaintiff sent a kite notifying health care that his knee was swollen and requested a joint fluid test as recommended by Dr. Zimont.  *Id.* at ¶ 145.  Finally, on October 17, 2011, NP Ingraham told plaintiff that he suffered only from mild arthritis, that he would receive no treatment other than Tylenol, and suggested that plaintiff use heat and self-massage of his knee.  *Id.* at ¶ 153.

Plaintiff further alleged that based upon the statements of Dr. Sudhir (her "'hands are tied' due to an MDOC, pain management 'policy' which restricts her from prescribing pain

---

[4] With respect to the "game plan," plaintiff noted that he was serving a life sentence, which implies that he would never receive treatment.  *Id.*

medications other than NSAIDs), Dr. Sohail ('my hands are tied'), NP Ingraham and NP Conklin ("my hands are tied") establish two policies. *Id.* at ¶¶ 141, 151 and 154. There were, first, that "orders, policies, or other forms of directives exist which prohibit PHS-employed doctors and nurse practitioners from prescribing pain medications for Plaintiff." *Id.* at ¶ 154. The second policy was that PHS "has issued orders, policies, or other forms of directives, which prohibit the defendant doctors and nurse practitioners from treating osteoarthritis, spondylosis, bone spurs, spinal nerve damage, fractured [medial] patella bones, torn meniscus cartilage, or chronic knee and back pain." *Id.* at ¶ 155.

### B. Plaintiff's Claims

Based on these allegations, plaintiff has filed 24 claims against defendants seeking declaratory relief, injunctive relief, compensatory damages and punitive damages. Plaintiff's claims are as follows:

### 1. NP Ingraham

Plaintiff has alleged five claims against NP Ingraham for deliberate indifference to his serious medical needs in violation of his Eighth Amendment rights.

Claim 1: NP Ingraham failed to treat plaintiff's osteoarthritis.

Claim 2: NP Ingraham failed to reasonably examine, diagnose and treat plaintiff's left knee and failed to refer plaintiff to a specialist.

Claim 3: NP Ingraham failed to reasonably examine, diagnose and treat plaintiff's back and failed to refer plaintiff to a specialist.

Claim 4: NP Ingraham failed to prescribe pain medication to relieve plaintiff's extreme pain in his lower back and right leg caused by serious injuries.

Claim 5:    NP Ingraham ignored the significant risk to plaintiff's future health by failing to treat his injured, swollen, unstable knee and injured spine.

## 2.    NP Conklin

Plaintiff has alleged five claims against NP Conklin for deliberate indifference to his serious medical needs in violation of his Eighth Amendment rights.

Claim 6:    NP Conklin failed to treat plaintiff's osteoarthritis.

Claim 7:    NP Conklin failed to reasonably examine, diagnose and treat plaintiff's left knee and failed to refer plaintiff to a specialist.

Claim 8:    NP Conklin failed to reasonably examine, diagnose and treat plaintiff's back and failed to refer plaintiff to a specialist.

Claim 9:    NP Conklin failed to prescribe pain medication to relieve plaintiff's extreme pain in his lower back and right leg caused by serious injuries.

Claim 10:    NP Ingraham ignored the significant risk to plaintiff's future health by failing to treat his injured, swollen, unstable knee and injured spine.

## 3.    Dr. Sudhir

Plaintiff has alleged five claims against Dr. Sudhir for deliberate indifference to his serious medical needs in violation of his Eighth Amendment rights.

Claim 11:    Dr. Sudhir failed to treat plaintiff's osteoarthritis.

Claim 12:    Dr. Sudhir failed to reasonably examine, diagnose and treat plaintiff's left knee and failed to refer plaintiff to a specialist.

Claim 13:    Dr. Sudhir failed to reasonably examine, diagnose and treat plaintiff's back and failed to refer plaintiff to a specialist.

Claim 14: Dr. Sudhir failed to prescribe pain medication to relieve plaintiff's extreme pain in his lower back and right leg caused by serious injuries.

Claim 15: Dr. Sudhir ignored the significant risk to plaintiff's future health by failing to treat his injured, swollen, unstable knee and injured spine.

### 3. Dr. Sohail

Plaintiff alleged five claims against Dr. Sohail for deliberate indifference to his serious medical needs in violation of his Eighth Amendment rights.

Claim 16: Dr. Sohail failed to treat plaintiff's osteoarthritis.

Claim 17: Dr. Sohail failed to reasonably examine, diagnose and treat plaintiff's left knee and failed to refer plaintiff to a specialist.

Claim 18: Dr. Sohail failed to reasonably examine, diagnose and treat plaintiff's back and failed to refer plaintiff to a specialist.

Claim 19: Dr. Sohail failed to prescribe pain medication to relieve plaintiff's extreme pain in his lower back and right leg caused by serious injuries.

Claim 20: Dr. Sohail ignored the significant risk to plaintiff's future health by failing to treat his injured, swollen, unstable knee and injured spine.

### 4. Dr. Burns

Plaintiff has alleged two claims against Dr. Burns for deliberate indifference to his serious medical needs in violation of his Eighth Amendment rights.

Claim 21: Dr. Burns failed to treat plaintiff's osteoarthritis or refer him to a specialist.

Claim 22: Dr. Burns failed to treat plaintiff's DJD.

### 5. PHS

Plaintiff has alleged two claims against PHS for deliberate indifference to his serious medical needs in violation of his Eighth Amendment rights.

Claim 23: PHS was "deliberately indifferent to Plaintiff's serious medical needs and violated Plaintiff's Eighth Amendment rights by promulgating or practicing policies which were sure or very likely to cause serious harm and needless suffering to Plaintiff by restricting the ability of other LCF medical staff to prescribe medications and order treatment for Plaintiff."

Claim 24: PHS "breached contract #071B9200147 with MDOC by failing to provide Plaintiff Blau with adequate health care commensurate with modern medical standards such as those outlined by the National Commission on Correctional Health Care and the American Correctional Association."

## II. Defendants' motion for summary judgment

### A. Legal standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further provides that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by":

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

"A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. Rules Civ. Proc. 56(c)(2). While the court needs to consider the cited materials, "it may consider other materials in the record." Fed. Rules Civ. Proc. 56(c)(3). Finally, "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. Rules Civ. Proc. 56(c)(4).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in deciding a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, the court is not bound to blindly adopt a non-moving party's version of the facts. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### B.    Eighth Amendment

Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, which confers a private federal right of action against any person who, acting under color of state law, deprives an individual of any right, privilege or immunity secured by the Constitution or federal laws.   *Burnett v. Grattan*, 468 U.S. 42, 45 n. 2 (1984); *Stack v. Killian*, 96 F.3d 159, 161 (6th Cir.1996).  To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

Plaintiff claims that defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment.   It is well established that an inmate has a cause of action under § l983 against prison officials for "deliberate indifference" to his serious medical needs, since the same constitutes cruel and unusual punishment proscribed by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97 (l976).   A viable Eighth Amendment claim consists of an objective and a subjective component.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  A court considering a prisoner's Eighth Amendment claim must ask both if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation and if the officials acted with a sufficiently culpable state of mind.  *Hudson v. McMillian*, 503 U.S. 1, 8 (1992).

The objective component requires the infliction of serious pain or failure to treat a serious medical condition.   *Hudson*, 503 U.S. at 8-9.  With respect to the infliction of serious pain, courts recognize that "[b]ecause routine discomfort is part of the penalty that criminal offenders pay for their offenses against society, only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation."  *Id.*

at 8 (internal citations and quotation marks omitted).  Similarly, "[b]ecause society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Id.* at 9.

The subjective component requires that the defendant act with deliberate indifference to an inmate's health or safety.  *See Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991).  To establish the subjective component, the plaintiff must show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.  Mere negligence in diagnosing or treating a medical condition does not constitute an Eighth Amendment violation.  *Id.* at 835.  "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishment Clause."  *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

## C.    Plaintiff's treatment history at LCF

In support of their motion, defendants have presented certifications of defendants Dr. Sohail (docket no. 44-2), NP Ingraham (docket no. 44-4), NP Conklin (docket no. 44-5), and Dr. Sudhir (docket no. 45-1) executed pursuant to 28 U.S.C. § 1746.  In addition to the certifications, defendants submitted  233 pages of plaintiff's medical records.  *See* Medical Records (docket nos. 44-3, 47, 47-1, 47-2, 47-3, 47-4 and 47-5).

### 1.    Plaintiff's medical history prior to the events alleged in this action

Plaintiff's medical records establish that he was seen and treated multiple times by various health care providers at LCF for his complaints of knee and back pain.  *See* Medical Records.  On July 23, 2009, several months before the acts alleged in this lawsuit, plaintiff was

assessed in a physical exam completed by non-party Hope Heebsh, P.A. *See* Sohail Cert.; Medical Records at pp. 215-18. At that visit, plaintiff stated that he had been told he had rheumatoid arthritis, that Naproxin, an NSAID, and Tylenol were the only combination of medications that provided pain relief and that he was unable to work out without these medications. *Id.* Plaintiff stated that his elbow was the most affected joint. *Id.* Plaintiff, who was then a 41-year-old male, was advised that a lengthy review of his medical records, labs and x-rays did not reveal any evidence of arthritis and that he did not suffer from rheumatoid arthritis. *Id.* During the July 23, 2009 visit, plaintiff was scheduled for an x-ray of his left elbow based on his complaints of pain in his elbow. *Id.* That x-ray also did not disclose any evidence of arthritis or other abnormalities. *Id.* Plaintiff was further advised that if the various tests and x-rays did not show evidence of arthritis, then he would be required to purchase regular over-the-counter analgesics through the prison store instead of receiving prescribed pain-killers. *Id.*

### 2. Plaintiff's treatment with defendants

Dr. Burns saw plaintiff on only one occasion (April 23, 2010). Sohail Cert. (docket no. 44-2). While plaintiff has alleged that he was seen by Dr. Burns on May 26, 2010, the medical records reflect that the plaintiff on April 23, 2010. *See* Medical Records at pp. 200-201. Dr. Burns reported that plaintiff stated he felt fine, that he had no arthritic pain, that he did "alot of weights" and that he "had dark stools in past when taking NSAIDs" *Id.* at p. 201. Dr. Burns noted full range of motion of plaintiff's extremities with no joint tenderness. *Id.* Dr. Burns assessed plaintiff's pain complaints as likely due to lifting heavy weights in the weight room. *Id.* Dr. Burns prescribed Vitamin D, but did not recommend further pain medications. *Id.* at pp. 200-201.

NP Ingraham saw plaintiff four times (October 14, 2010, February 10, 2011, April 12, 2011 and August 3, 2011). Ingraham Cert. (docket no. 44-4). On October 14, 2010, plaintiff reported that he had started jogging and lifting weights, reported constipation and left knee pain, and requested over-the-counter vitamins, a sleeve for his knee, and cortisone injections. *Id.* NP Ingraham educated plaintiff on knee strengthening exercises, advised him to continue using Mobic for pain relief, and to discontinue jogging and weight-lifting if those activities resulted in knee pain. *Id.* When plaintiff reportedly fell from his bunk on February 10, 2011, Ingraham examined plaintiff and gave him a five-day prescription for Baclofen and a one month prescription for Mobic for pain relief. *Id.* Ingraham examined plaintiff on April 12, 2011, found no spinal abnormalities, and scheduled plaintiff for a physician's examination on April 26, 2011with respect to reported tenderness in plaintiff's left knee and mild pain with motion. *Id.* On August 3, 2011, Ingraham discussed the PMC recommendations with plaintiff. *Id.*

NP Conklin saw plaintiff on only one occasion (January 31, 2011). Conklin Cert. (docket no. 44-5). At that appointment, Conklin assessed plaintiff's symptoms and prescribed Tylenol and cortisone injections as treatment for his knee pain. *Id.*

Dr. Sudhir saw plaintiff on three occasions (February 26, 2011, September 2, 2011 and September 19, 2011). *See* Sudhir Cert. (docket no. 45-1). At these times, Dr. Sidhur determined that no further treatment was indicated for plaintiff's small fracture of the left patella; noted that plaintiff's left knee was swollen, and based on plaintiff's complaint of knee pain advised plaintiff to cease "performing knee squat exercises in the weight pit"; noted that there was no indication in plaintiff's medical records that he suffered from a "bleeding ulcer" due to the use of NSAIDs; met

with plaintiff to discuss the June 29, 2011 PMC recommendation, and assisted plaintiff with an application to the PMC for re-evaluation of his pain medication. *Id.*

Dr. Sohail saw plaintiff five times (September 7, 2010, March 8, 2011, April 26, 2011, June 21, 2011 and July 11, 2011). Sohail Cert. (docket no. 44-2). At these times, Dr. Sohail treated plaintiff's complaints of pain by ordering an x-ray of his left knee, ordering a follow-up x-ray of his left knee, ordering an x-ray of his spine, administering three steroid injections to plaintiff's left knee, ordering plaintiff a bottom bunk detail, requesting a prescription for Celebrex (which the MDOC Regional Medical Officer deferred, recommending Mobic as an alternative pain medication) and requesting a prescription for Tegretol (an anticonvulsant medication which has been used to treat chronic pain since the mid-1980s). *Id.*

Plaintiff also saw non-defendant Charles Zimont, M.D., who administered a fourth steroid injection to plaintiff's left knee. *Id.*

Plaintiff received the following diagnostic tests and treatments: x-ray of left knee (September 9, 2010); and x-ray of left knee and lower spine (March 18, 2011). *Id.*

Plaintiff's allegations against defendants also include references pain medication requests made to the MDOC's PMC. The MDOC established the PMC to address the appropriate and consistent management of pain for MDOC inmates. *Id.* The PMC, which is composed of three health care providers with rotating terms, seeks to improve the physical and psychosocial symptoms associated with pain while maintaining a patient's level of function. *Id.* Dr. Sohail explained the operation of the PMC:

> 17. Patients have highly variable responses to pain. Whenever possible, the PMC will follow established protocols to treat chronic pain to a medically recognized standard. This process may not result in a plan that completely satisfies the patient, especially if the patient has a substance abuse history, unrealistic

expectations of pain control, or is unreceptive to education regarding his or her pain management plan. Pain control must be balanced with the need to function in life and to minimize the risk of prescription drug abuse. Excessive medication, while it may resolve a patient's pain, will threaten the patient's health and undermine the quality of that patient's life. The correctional setting compounds the problems with pain medications. Pain medications can be very dangerous because they are used illicitly to get high, are traded for contraband, and are used in suicide attempts. Even when the patient does not intend to misuse the prescription, the patient becomes a target of violence or other manipulation to obtain access to the patient's drugs. In addition, many inmates have a history of drug abuse and the use of narcotic analgesics may cause the recurrence of dependence.

18. The PMC recognizes the dangers involved in the correctional setting and must assess every pain medication with the issue of abuse in mind. Consequently, the PMC may modify recommendations received from outside of prison based on the special needs of the MDOC healthcare system. The PMC may also modify the access a patient has to his or her pain medication due to such behaviors as diversion, hiding of medications under the tongue ("cheeking"), selling of medications, hoarding of medications, taking medications in excess of the recommended dosage, or refusing medications.

*Id.* at ¶¶ 17-18.

Here, plaintiff's amended complaint refers to two PMC recommendations. First, on June 29, 2011, the PMC recommended the following treatment for plaintiff: Tylenol up to 2 grams per day; offer a formulary NSAID of choice of to 1/2 maximum dose; stop Tegretol and Vitamin D; and self-massage, heat, and range of motion and stretching exercises. Amend. Compl. at ¶¶ 113 and 117; Medical Records at p. 123 (docket no. 47-3 at p. 23); Sohail Cert. Second, on October 6, 2011, the PMC restated its recommendation with respect to the Tylenol, self-massage, heat, and range of motion and stretching exercises, stated that "if the MP feels (not patient) MRI indicated, submit 407," and that there was "no indication for non formulary RX." Amend. Compl. at ¶ 137; Medical Records at p. 90 (docket no. 47-2 at p. 40).

The medical staff also made reference to observations of plaintiff which appeared inconsistent with his claims of severe pain, e.g.: RN Deanna Earl noted in a follow-up clinical

progress note that the day of plaintiff's reported bunk fall (February 10, 2011), he was up and ambulatory around the unit and had been observed bending and moving a television off of a counter without apparent discomfort; and medical records reflect that plaintiff was observed walking in the prison yard with a brisk gait and no limp (February 26, 2011). Sohail Cert.

> **D.** **Plaintiff's claims against with Dr. Burns, Dr. Sohail, NP Ingraham, NP Conklin, and Dr. Sudhir**

The medical record demonstrates that plaintiff received ongoing medical care by defendants during the operative dates of plaintiff's complaint (April 23, 2010 through October 17, 2011). Plaintiff disputes this care in both his "verified" amended complaint and a document entitled "Affidavit of James Blau, plaintiff in pro per" (docket no. 49) filed in opposition to the motion for summary judgment.[5] As discussed, *supra*, plaintiff's amended complaint outlines an extensive history of treatment by defendants. His 171-paragraph affidavit in opposition to the motion for summary judgment essentially re-states the allegations in the amended complaint.[6]

Neither plaintiff's amended complaint nor his affidavit are notarized. Rather, these documents attempt to qualify as unsworn declarations under 28 U.S.C. § 1746, which provides that any matter which "is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit, in writing of the person making the same . . . may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person

---

[5] The notes that a verified complaint has the same force and effect as an affidavit for purposes of responding to a motion for summary judgment. *See Lavado v. Keohane*, 992 F.2d 601, 605 (6th Cir. 1993).

[6] In his affidavit, plaintiff refers to events which occurred on October 17, 2011, in which NP Ingraham advised plaintiff that "PHS/MDOC would not treat or repair any torn meniscus injuries." Blau Aff. at ¶ 153.

which is subscribed by him, as true under penalty of perjury." 28 U.S.C. § 1746(2). Such statements must be made in substantially the following form "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date). (Signature)". 28 U.S.C. § 1746(2).

However, neither the amended complaint nor the affidavit comply with the requirements of § 1746. With respect to his amended complaint, plaintiff did not declare that his statements were "true and correct" as required by the statute, but diluted that language, stating: "I, James Edmund Blau, swear under penalty of perjury that the foregoing is true and correct *to the best of my knowledge, belief and information*." Amend. Compl. at p. 33 (emphasis added). Similarly, plaintiff diluted the language in his affidavit, stating that "I, James Blau, Plaintiff in pro per, swear under penalty of perjury that the foregoing is true and correct *to the best of my knowledge and belief*." Blau Aff. at p. 28 (emphasis added) (docket no. 49). Neither of these documents are declarations sufficient to create a genuine issue of material fact sufficient to defeat a motion for summary judgment, because plaintiff does not state that these facts are based upon his "personal knowledge" as required by Fed. Rules Civ. Proc. 56(c)(4) (a declaration used to support or oppose a motion "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated")

Consistent with Fed. Rules Civ. Proc. 56(c)(4) and its predecessor, courts have applied a strict personal knowledge requirement to affidavits or declarations submitted in summary judgment proceedings. *See, e.g., Totman v. Louisville Jefferson County Metro Government*, 391 Fed.Appx. 454, 464 (6th Cir. 2010) (to constitute evidence sufficient to support or oppose a motion for summary judgment, an affidavit "must be made on personal knowledge, set out facts that would

be admissible in evidence, and show that the affiant is competent to testify on the matters stated;" thus, a complaint which included a verification stating facts that are true and correct to the best of the affiant's "knowledge and belief" indicated that the allegations of the complaint went beyond the plaintiff's personal knowledge, that the allegations extended to matters within the plaintiff's "beliefs," and that the plaintiff's "beliefs" did not meet the evidentiary standard set forth in Fed. Rules Civ. Proc. 56(e)(1) (predecessor to Fed. Rules Civ. Proc. 56(c)(4)); *Alpert v. United States*, 481 F.3d 404, 409 (6th Cir.2007) (holding that the affiant's "statement. . . based upon his 'belief'. . . did not demonstrate the personal knowledge required by Fed.R.Civ.P. 56(e)"); *Pace v. Capobianco*, 283 F.3d 1275, 1278 (11th Cir. 2002) (the "personal knowledge requirement [of Rule 56] prevents statements in affidavits that are based, in part, 'upon information and belief' - instead of only knowledge - from raising genuine issues of fact sufficient to defeat summary judgment"); *Dellacava v. Painters Pension Fund of Westchester and Putnam Counties*, 851 F.2d 22, 27 (2d Cir.1988) (statements in an affidavit made "upon information and belief" have "no probative value and may not be considered in a motion for summary judgment").

Nevertheless, even if the court accepted plaintiff's amended complaint and affidavit as declarations under § 1746 with respect to plaintiff's claims regarding the pain he experienced (a factual matter which would be within his own personal knowledge), plaintiff does not establish a genuine issue of material fact with respect to  defendants' alleged deliberate indifference with respect to treating that pain.  While the amended complaint and affidavit could establish that plaintiff suffered from a serious medical condition, they would not establish an Eighth Amendment violation. This is not a case where defendants simply ignored plaintiff's serious medical needs.  By plaintiff's own admissions, defendants evaluated and re-evaluated plaintiff's condition, prescribed pain

medication, educated plaintiff (i.e., do not jog or lift weights if it hurts), ordered diagnostic tests, provided four steroid injections, and processed two medication requests to the PMC. At most, plaintiff points out his disagreement with defendants' regarding his medical diagnoses, the need for a specialist and the types of pain relievers to which he felt entitled in the prison setting.

The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cir. 1976). This action falls in the latter category. "[W]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Graham ex rel. Estate of Graham v. County of Washtenaw*, 358 F.3d 377, 385 (6th Cir. 2004), quoting *Westlake*, 537 F.2d at 860 n. 5. In short, federal judges do not pretend to be medical doctors. While plaintiff disagrees with the doctor's medical judgment and wants to have treatment contrary to that judgment, this disagreement does not rise to the level of a federal constitutional claim. *See Lyons v. Brandly*, 430 Fed. Appx. 377, 380-81 (6th Cir. 2011) (although the plaintiff prisoner suffered from a serious medical condition during his incarceration as a result of his urethral stricture, he failed to establish that the defendants acted with a sufficiently culpable state of mind because "[t]he fact that alternative procedures might have better addressed [a prisoner's] particular needs does not show that the [defendants were] deliberately indifferent to his medical needs") (quoting *Graham*, 358 F.3d at 384); *Woodberry v. Simmons*, 146 Fed.Appx. 976, 977 (10th Cir. 2005) ("a difference of opinion between a prisoner and the prison medical staff about medical treatment does not constitute deliberate indifference"); *Owens v. Hutchinson*, 79 Fed. Appx. 159, 161 (6th Cir. 2003) ("[a]

patient's disagreement with his physicians over the proper medical treatment alleges no more than a medical malpractice claim, which is a tort actionable in state court, but is not cognizable as a federal constitutional claim").

In *Greenman v. Prisoner Health Services*, No. 1:10-cv-549, 2011 WL 6130410 (W.D. Mich. Dec. 8, 2011), the Court addressed a similar claim plaintiff that plaintiff did not receive his preferred pain medication:

> Plaintiff's contentions in this case make a mockery of the Eighth Amendment standard, which requires that responsible medical officials recklessly "delay or deny" needed treatment to a prisoner, resulting in the wanton and unnecessary infliction of pain. The undisputed medical record shows a constant – almost daily – attention to plaintiff's complaints about his medications. Like all physicians, in and out of the prison setting, [defendant doctor] was required to balance the need for pain relief against the dangerous side effects, including potential for addiction, posed by most strong pain medications. The Eighth Amendment has virtually no bearing on this process, as long as the physician is acting pursuant to arguably reasonable medical protocols.

> Plaintiff has not presented evidence sufficient to support the subjective component of an Eighth Amendment claim for deliberate indifference to serious medical needs against [defendant doctor]. The record shows that defendant treated plaintiff's condition on an ongoing basis with appropriate medications. Plaintiff's preference for narcotics and his dissatisfaction with the non-narcotic pain medications prescribed by [defendant doctor] falls far short of supporting an Eighth Amendment claim.

*Greenman*, 2011 WL 6130410 at *10.

Based on this record defendants Dr. Syed Sohail, Dr. Bhamini Sudhir, Dr. Brian Burns, NP Ryan Ingraham, and NP Jolane Conklin were not deliberately indifferent to plaintiff's serious medical needs. Accordingly, these individual defendants are entitled to summary judgment as to plaintiff's allegations against them as set forth in Claims 1 through 22.

### E. Plaintiff's claims against defendant PHS

### 1. Deliberate indifference

A plaintiff who sues a private or public corporation for constitutional violations under § 1983 must establish that a corporate policy or custom caused the alleged injury. *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 904 (6th Cir. 1998); *Street v. Corrections Corporation of America*, 102 F.3d 810, 818 (6th Cir. 1996). In order to state a § 1983 claim against PHS, plaintiff must allege the existence of a policy, practice or custom that both violated his Eighth Amendment rights and resulted in an injury. *See Starcher v. Correctional Medical Systems, Inc.*, 7 Fed. Appx. 459, 465 (6th Cir. 2001) (a prisoner's § 1983 claim against a corporation providing medical services at a state correctional facility must "be premised on some policy that caused a deprivation of [a prisoner's] Eighth Amendment rights"); *Moreno v. Metropolitan General Hospital*, No. 99-5205, 2000 WL 353537 at *2 (6th Cir. March 28, 2000) (in order to state a § 1983 claim against PHS, plaintiff "must allege the existence of a policy, practice or custom that resulted in the injury"). "It is not enough for a complaint under § 1983 to contain mere conclusory allegations of unconstitutional conduct by persons acting under color of state law. Some factual basis for such claims must be set forth in the pleadings." *Chapman v. City of Detroit*, 808 F.2d 459, 465 (6th Cir. 1986). *See Bartalone v. Berrien County*, 643 F. Supp. 574, 578-79 (W.D. Mich. 1986) (a plaintiff in a § 1983 action "must allege sufficient facts to establish the probable existence of the pattern, custom, or policy of which [he] complains.").

Plaintiff offers no factual allegations that PHS violated his constitutional rights other than the conclusory claim that "by promulgating or practicing policies which were sure or very likely to cause serious harm and needless suffering to Plaintiff by restricting the ability of other LCF

medical staff to prescribe medications and order treatment for Plaintiff." *See* Claim 23. In his brief, plaintiff states that PHS's policy is established by the individual defendants' statements to him that "their 'hands were tied' by policies which restricted them from administering treatment, referring Plaintiff to specialists, and giving Plaintiff the proper pain medication for the severe and chronic pain from three separate and serious medical conditions." Plaintiff's Brief (docket no. 50) at p. 39. However, as discussed, the five individual defendants from LCF provided plaintiff consistent ongoing evaluation and care for his complaints of knee and back pain, including requests made to the MDOC's PMC. Where plaintiff cannot prove that there was an Eighth Amendment violation by the medical treaters, there is no basis for claiming that the treaters' employer, PHS, had an unconstitutional policy.

Plaintiff also refers to the "PHS pain management board" as denying medication requests. As pointed out in Dr. Sohail's certification, the pain management board or PMC is part of the MDOC, not PHS. *See also, Greenman v. Oulette*, No. 1:10-cv-549, 2010 WL 2901873 (W.D. Mich. July 23, 2010) (both the Quality Assurance Office and the Pain Management Committee are administrative units of the MDOC). Whether the MDOC's PMC allowed the individual defendants to prescribe any particular pain medication is not a matter of PHS policy but rather a matter of MDOC policy in managing its prison population's access to drugs. The only other medical decision referred to by plaintiff is PHS's decision to deny Dr. Sohail's request for an MRI. Plaintiff's Brief at p. 36. This particular violation, however, is not alleged in plaintiff's amended complaint, having occurred about three months after plaintiff filed this action.[7]

---

[7] It appears that this occurred in January 2012. *See* Order (docket no. 64) (denying plaintiff's motion to supplement the amended complaint).

It appears from his allegations that plaintiff also seeks to hold PHS vicariously liable for the acts of the individual defendants. Even if plaintiff could show that the individual defendants violated his constitutional rights, PHS cannot be held vicariously liable for the constitutional violations of its agents on the basis of respondeat superior. *See Starcher*, 7 Fed. Appx. 465. Rather, PHS' "liability must also be premised on some policy that caused a deprivation of [the plaintiff's] Eighth Amendment rights." *Id.* Accordingly, PHS is entitled to summary judgment with respect to plaintiff's allegation of deliberate indifference as set forth in Claim 23.

### 2. State law claim for breach of contract

In his Claim 24, plaintiff alleged that PHS breached its contract with the State of Michigan, and plaintiff seeks to recover as a third-party beneficiary to that contract. In his brief, plaintiff alleged that PHS "breached contract #071B92000147 when the [sic] failed to provide plaintiff Blau with adequate medical care consistent with the standards set by court decision, legislation, MDOC policy and procedure, HEDIS Measurement criteria, National Commission of Correctional Health Care Standards, and prevailing community standards." Plaintiff's Brief at p. 37. This remaining claim involves an alleged breach of contract in violation state law. Title 28 § 1367 provides that "the district courts shall have supplemental jurisdiction over all other claims that are so related to the claims in the action within such original jurisdiction that they form a part of the same case or controversy." 28 U.S.C. § 1367(a). Here, the court exercised its supplemental jurisdiction over plaintiff's state law claims, because those claims appeared intimately related to the alleged § 1983 violation. The dismissal of plaintiff's federal claim against defendants, however, requires the court to re-examine the issue of supplemental jurisdiction for state law claims against this defendant. Section 1367(c)(3) provides that a district court may decline to exercise

supplemental jurisdiction over a claim if the court "has dismissed all claims over which it has original jurisdiction." Thus, once a court has dismissed a plaintiff's federal claim, the court must determine whether to exercise, or not to exercise, its supplemental jurisdiction under § 1367. *See Campanella v. Commerce Exchange Bank*, 137 F.3d 885, 892-893 (6th Cir. 1998).

As a general rule "[w]hen all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims." *Musson Theatrical, Inc. v. Federal Express Corp.*, 89 F.3d 1244, 1254-1255 (6th Cir. 1996). Here, the Court has rejected plaintiff's federal claims. There is no reason to retain supplemental jurisdiction over plaintiff's state law claim. Accordingly, the court should dismiss plaintiff's Claim 24.

## IV. Recommendation

For the reasons set forth above, I respectfully recommend that the motion for summary judgment filed by defendants PHS, Dr. Syed Sohail, Dr. Bhamini Sudhir, Dr. Brian Burns, NP Ryan Ingraham, and NP Jolane Conklin (docket no. 44) be **GRANTED** as to plaintiff's Claims 1 through 23.

I further recommend that plaintiff's Claim 24 (breach of contract) be **DISMISSED** without prejudice.

I further recommend that this case be **TERMINATED**.


Entered: August 19, 2013                    /s/ Hugh W. Brenneman, Jr.
                                            Hugh W. Brenneman, Jr.
                                            U.S. Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).